IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-03191-RBJ

TYENNE KAY ZUMPONE,

    Plaintiff,

v.

ANDREW SAUL, Acting Commissioner of Social Security,

    Defendant.

## ORDER

This matter is before the Court on review of the Social Security Administration Commissioner's decision denying claimaint Tyenne Kay Zumpone's application for Supplemental Security Income ("SSI") and Social Security Disability Insurance ("SSDI"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court reverses the Commissioner's decision and remands for further analysis.

### I. STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if her physical and/or mental impairments preclude her from performing both her previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2). To be disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

This appeal is based upon the administrative record and the parties' briefs. In reviewing a final SSA decision, the District Court examines the record and determines whether it contains substantial evidence to support the decision and whether SSA applied correct legal standards. *Winfrey v. Charter*, 92 F.3d 1017, 1019 (10th Cir. 1996). The District Court's determination of whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Reversal may be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

## II. BACKGROUND

### A. Procedural Background

Ms. Zumpone applied for SSDI on November 15, 2016 and for SSI on December 28, 2016. ECF No. 11-2 at 15. Both applications were denied on July 17, 2017. ECF No. 11-3 at 2-3. Ms. Zumpone timely requested a hearing and appeared before Administrative Law Judge Debra Boudreau ("ALJ") on January 29, 2019. ECF No 11-2 at 36. On March 14, 2019 the ALJ issued an unfavorable opinion and found that Ms. Zumpone did not have a qualifying disability. ECF No 11-2. Ms. Zumpone appealed, and the Appeals Council declined to review the decision, making the ALJ's decision final. ECF No. 11-2 at 2. On November 11, 2019 Ms. Zumpone filed a timely complaint and petition for review in this Court. ECF No. 1.

**B. Factual Background**

Ms. Zumpone is a forty-six-year-old former certified nursing assistant ("CNA"). ECF No. 11-2 at 43. She worked as a CNA for nearly twenty years. ECF No. 11-9 at 3. She began having difficulty with her CNA responsibilities due to persistent pain and her inability to walk. *Id*. In 2012 Ms. Zumpone stopped working as a CNA when she almost dropped a patient and almost caught a house on fire "due to her hands not working." *Id.* After years of medical testing Ms. Zumpone was ultimately diagnosed with fibromyalgia, obesity, transient ischemic attack, anxiety, depression, possible conversion disorder, arthritis, carpal tunnel syndrome, and memory loss, among other diagnoses.

Beginning in 2015 Ms. Zumpone began seeing numerous health care professionals for a wide variety of health problems. In April 2015 Ms. Zumpone saw Aimee Phipps, PA-C, and reported having musculoskeletal pain. ECF No. 11-11 at 69. Ms. Phipps performed several tests and found that Ms. Zumpone had sixteen out of the eighteen fibromyalgia tender points. *Id.* As a result, Ms. Zumpone was diagnosed with fibromyalgia. *Id.* Furthermore, Ms. Phipps diagnosed Ms. Zumpone as obese and discussed several risk factors associated with rapid weight gain. *Id.*

On July 19, 2015 Ms. Zumpone was admitted to the hospital. She complained of weakness on her left side, back pain, and numbness in her extremities. ECF No. 22-7 at 10. She also reported mild vision changes and seeing black spots in front of her. *Id.* Her treating physician noted that at times her right pupil was larger than her left. *Id*. at 10. While in the hospital Ms. Zumpone was given an MRI, which revealed some abnormalities in her spinal discs, including trace paracentral protrusion, minimal central protrusion, and a small central protrusion

without spinal canal stenosis.  ECF No. 11-7 at 11.  She was ultimately diagnosed with a transient ischemic attack, also known as a stroke.  *Id.* at 35.  She was released from the hospital on July 21, 2015.  *Id.* at 34.

On July 30, 2015 Ms. Zumpone again saw Ms. Phipps, where she was treated for hand clumsiness and continued weakness in her extremities.  ECF No. 11-11 at 74.  Ms. Phipps noted that Ms. Zumpone continued to experience left-sided weakness but could not be sure if this weakness was a result of Ms. Zumpone's own effort.  *Id.*

On January 5, 2016 Ms. Zumpone was again hospitalized and reported paresthesia, or numbness, and shortness of breath.  ECF No. 11-7 at 35.  She was discharged on the same day she was admitted.  *Id.*  Ms. Zumpone saw Kyle C. Vogel, M.D. on October 25, 2016 for left-side weakness and pain.  ECF No 11-11 at 93.  She reported additional weight gain, chest pain, and dyspnea.  *Id.*

In May 2017 Ms. Zumpone saw Melissa Haberzetti, MPT, a physical therapist who performed a functional assessment to determine whether Ms. Zumpone could perform certain activities.  ECF No. 11-8 at 41.  Ms. Haberzetti concluded that Ms. Zumpone could never do the following: stand for more than a few minutes at a time, stand from a squatting position, climb stairs or ladders, or balance.  *Id.* at 42.  She found that Ms. Zumpone could sometimes engage in repetitive bending.  *Id.*

On May 25, 2017 Victor Neufeld, Ph.D., conducted a psychiatric evaluation of Ms. Zumpone for the purposes of assisting SSA in determining her disability status.  During the evaluation Ms. Zumpone reported experiencing terrible pain, abnormal sleeping patterns, and depressive tendencies.  ECF No. 11-8 at 61.  Dr. Neufeld's report states that Ms. Zumpone was

4

cooperative but coughing and writhing nonstop. *Id.* at 62.  She walked with the support of her boyfriend.  *Id.*  During Dr. Neufeld's evaluation, Ms. Zumpone was unable to correctly subtract 7 from 100 or 3 from 20, "suggesting either impaired basic arithmetic or working memory difficulties."  *Id.* at 63.  He concluded the following: "Ms. Zumpone has at least moderate, possibly marked impairment in ability to recall instructions," "moderate to marked impair[ment] in social interaction," and "moderate and marked impairment in persistence and pace due to depression, anxiety, and slower processing speed."  *Id.* at 63.  He concluded that "Ms. Zumpone will need assistance with travel and managing her "medical issues" and "finances."  *Id.*

Following Dr. Neufeld's examination, Disability Determination Services requested that Ms. Zumpone see a different psychologist for another evaluation.  ECF No. 11-9 at 2.  As a result, Ms. Zumpone saw Dr. David Benson on June 15, 2017.  *Id.*  Ms. Zumpone reported experiencing fibromyalgia, complications from her earlier stroke, and tingling and numbness in her extremities.  *Id.*  Dr. Benson noted that due to her pain she had difficulty keeping up with household tasks and daily hygiene.  ECF No. 11-9 at 4.  He further opined that Ms. Zumpone suffers from "anxiety-based symptoms," that she is "prone to obsessive worrying," and "[i]t is difficult for her to be in social situations."  ECF No. 11-9 at 5.  Dr. Benson stated that Ms. Zumpone was cooperative and genuine throughout the exam.

Dr. Benson also performed an intellectual functioning test on Ms. Zumpone.  She scored in the one percentile for her full-scale IQ with a score of 65.  *Id*. at 6.  Dr. Benson classified Ms. Zumpone in the "extremely low range of intellectual functioning."  *Id.*  Dr. Benson determined that Ms. Zumpone "has marked deficits in various areas, especially Processing Speed but also Verbal Comprehension."  *Id.* at 8.  He opined that these deficits would cause her to struggle

"even in unskilled jobs" *Id.* According to Dr. Benson, Ms. Zumpone's situation "ha[s] evolved to a point that she cannot live or function completely independently o[r] competitively." *Id.* He concluded with the following: "Ms. Zumpone is an intellectually limited woman with the likely addition of cognitive injury sustained by a stroke. She is highly anxious and prone to irritability and anger. As a result, she is not able to support herself and is also not independent in Activities of Daily Living." *Id.* at 9.

After Dr. Neufeld and Dr. Benson submitted their opinions, SSA asked another doctor, Douglas Hanze, Ph.D., to review the evidence and develop an opinion as to Ms. Zumpone's disability status. Dr. Hanze never met nor examined Ms. Zumpone. Instead, he reached his conclusion by reviewing her medical record. Dr. Hanze concluded that Ms. Zumpone did not have a qualifying disability that would make her eligible to receive either SSDI or SSI. ECF No. 11-3 at 17. After reviewing the medical record, Dr. Hanze concluded that Ms. Zumpone was "not significantly limited" in the following: ability to sustain an ordinary routine without special supervision, ability to carry out short, simple instructions, ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanness. ECF No. 11-3 at 17. Dr. Hanze's opinion as to Ms. Zumpone's ultimate condition was that her "symptoms may interfere with completion of [a] normal workday or workweek . . . . However, when work does not require more than simple instructions, ordinary routines and simple decision making, limitations of attendance and pain will not prevent completion of normal workday/workweek . . . ." *Id.* at 18.

### C. March 14, 2019 ALJ Decision

After conducting a hearing and reviewing Ms. Zumpone's medical record, the ALJ found that Ms. Zumpone did not have a qualifying disability. In reaching her opinion, she applied the five-step sequential process. ECF No. 11-2 at 16.

At step one, the ALJ found that Ms. Zumpone met the insured status requirements and that she had not engaged in substantial gainful activity since July 19, 2019, the alleged onset date of her disabilities. *Id. at 17*. At step two, the ALJ found that Ms. Zumpone suffered from the following severe impairments: "residuals of cerebral vascular accident, obesity, fibromyalgia, borderline intellectual functioning disorder, unspecified depressive disorder, conversion disorder, and anxiety disorder." *Id.* The ALJ stated that "the claimaint's impairments are severe, in combination if not singly, because they cause limitations or restrictions having more than a minimal effect on claimaint's ability to perform basic work activities . . . ." *Id*. at 18. The ALJ found that Ms. Zumpone's carpal tunnel syndrome was non-severe because it did not affect her ability to perform basic activities. *Id*. At step three, the ALJ found that claimaint's disabilities, when viewed either isolated or together, did not fall under any of the listings in 20 C.F.R. Part 404, Subpart P. *Id.*

When conducting her analysis at the fourth step of the sequential process, the ALJ weighed several doctors' and medical professionals' opinions. She assigned great weight to two SSA medical consultants, Dr. Phelps and Dr. Hanze. *Id*. at 27. In doing so, the ALJ reasoned, "[t]he undersigned gives great weight because the opinion[s] [are] based on a review of the case record that includes medical reports . . . . In addition, the State agency medical consultant[s] [understand] Social Security disability program policies . . . ." *Id.*

The ALJ assigned little weight to Dr. Benson's and Dr. Neufeld's opinions. In her explanation as to why she found Dr. Neufeld's opinion unpersuasive, she wrote, "[t]he assessment of [Dr. Neufeld] is given little weight. The assessment found that the claimaint had several marked mental limitations. . . . The objective medical evidence or other medical evidence does not support this assessment. . . ." ECF No. 11-2 at 27. Regarding Dr. Neufeld's opinion that Ms. Zumpone "had several marked mental limitations," the ALJ found that his opinion was not supported by the evidence because other sources described her as "pleasant and cooperative." *Id.* at 27-28. For both Dr. Benson and Dr. Neufeld, the ALJ further stated, "[m]oreover, the medical source did not have a lengthy treatment relationship with the claimaint, frequently exam the claimaint, or have a longitudinal understanding of the claimaint's impairments. Accordingly, this opinion is given little weight."

The ALJ also ascribed little weight to the opinion of Aimee Phipps, PA-C. who opined that Ms. Zumpone had several extreme physical limitations. *Id.* at 28. She further opined that Ms. Zumpone could "never kneel or crawl, stand or walk, and could only lift up to ten pounds sometimes." As to why she gave Ms. Phipps's opinion little weight, the ALJ explained, "this opinion appears to have been written based largely on the claimaint's subjective complaints . . . ." *Id.*

After weighing the medical professionals' opinions, the ALJ found that Ms. Zumpone had the following residual functional capacity:

> [Ms. Zumpone] has the residual functional capacity to perform light work . . . except the claimaint can lift/carry twenty pounds occasionally and ten pounds frequently; can sit/stand/walk six hours in an eight-hour workday; can never climb ladders, ropes or scaffold; can occasionally climb stairs and ramps; can frequently balance; can occasionally stoop, kneel, crouch, or crawl; must avoid work at unprotected heights or close proximity heavy moving machinery [sic]; can understand and remember simple

>routine tasks; can sustain concentration, persistence, and pace for simple routine tasks over an eight-hour workday and forty-hour workweek; can tolerate occasional interactions with the general public, coworkers and supervisors; can make simple work decisions; can tolerate task changes; and can travel and avoid workplace hazards

*Id.* at 22-3.  The ALJ, relying on hearing testimony from a vocational expert, found that Ms. Zumpone could perform light, unskilled work such as a marking clerk, product assembler, or mail clerk.  ECF No. 11-2 at 30.  Based on these findings, the ALJ held that Ms. Zumpone did not qualify for SSI or SSDI under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  *Id*. at 31.

### III. ANALYSIS

Ms. Zumpone seeks review of the ALJ's March 14, 2019 decision.  She argues that the ALJ's RFC determination is not supported by the medical record.  She claims that the ALJ improperly weighted Dr. Douglas Hanze's opinion.  ECF No. 12 at 11.  Ms. Zumpone also alleges that the ALJ did not provide any legitimate rationale for discounting Dr. Neufeld's and Dr. Benson's opinions.  *Id.*  Defendant counters that the ALJ's decision is supported by substantial evidence.  *See* ECF No. 16.

**A. The ALJ's RFC Determination**

The ALJ must consider all evidence in the record when determining a claimaint's RFC.  20 C.F.R. 404.1545(a)(1).  The ALJ must first determine whether the claimaint has an RFC that would enable her to perform past relevant work.  20 C.F.R. 404.1545(a)(5)(i).  If the ALJ finds that claimant is unable to perform past relevant work, then she "will use the same assessment . . . to decide if [the claimaint] can adjust to any other work that exists in the national economy."  20 C.F.R. § 404.1545(a)(5)(ii).

Here, the ALJ found that Ms. Zumpone could not perform her past relevant work; i.e., her CNA duties. ECF No. 11-2 at 22-23. The ALJ therefore assessed whether Ms. Zumpone could perform other work in the national economy. *Id.* Ms. Zumpone argues that the ALJ erred at this step in her analysis. According to Ms. Zumpone, the ALJ's RFC determination—that she could perform a reduced range of light work—is not supported by substantial evidence. ECF No. 12 at 12. She claims the ALJ erred "because she failed to properly weigh the opinions of Dr. Neufeld and Dr. Benson, subordinating both to the opinions of a non-examining State agency physician." *Id.*

Ms. Zumpone takes issue with the ALJ's RFC determination for two primary reasons: (1) the ALJ failed to discuss the consistency between Dr. Benson's and Dr. Neufeld's opinions in her RFC analysis, and (2) the factors outlined in 20 C.F.R. § 404.1527(c) do not support the ALJ's decision to discount the opinions of examining sources in favor of a non-examining source. I address each argument in turn.

1. Consistency between Dr. Neufeld's and Dr. Benson's consultative opinions

I first determine whether the ALJ erred by not considering the consistency between Dr. Neufeld's and Dr. Benson's opinions. Ms. Zumpone argues the ALJ erred because her decision does not reference the consistencies between Dr. Neufeld's and Dr. Benson's opinions. ECF No. 12 at 12. Defendant argues that the law imposes no such requirement on the ALJ. ECF No. 16 at 11. I agree with defendant.

ALJs are instructed to give more weight to medical opinions if they are consistent with the medical evidence as a whole. 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more wight we will give to that opinion.").

Here, Ms. Zumpone misstates the law. ALJs are not legally required to compare every medical opinion to every other medical opinion in the record. Rather, the ALJ must consider whether a medical opinion is consistent with the *entire* medical record. *See* 20 C.F.R. 404.1527(c)(4). While the ALJ did not explicitly state she compared Dr. Neufeld's opinion to Dr. Benson's, she did state that both of their opinions were "inconsistent with medical records from other sources." ECF No. 11-2 at 28. The ALJ certainly could have strengthened her analysis by discussing why her decision was appropriate despite consistencies between the two doctors' opinions. However, she was not legally required to do so. Thus, the ALJ did not err by failing to acknowledge the consistencies between Dr. Benson's and Dr. Neufeld's opinions.

    2. <u>Weight of medical source opinions in RFC determination</u>

I next consider whether the ALJ's weighing of the medical source opinions during her RFC analysis is supported by law. In the Tenth Circuit, the opinion of a treating physician is entitled to controlling weight if it "is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014) (quoting *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)) (internal quotations omitted). "An ALJ may decline to give controlling weight to the opinion of a treating physician where he articulates specific, legitimate reasons for his decision." *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (quoting *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008)) (internal quotations omitted).

Regarding non-treating sources, an ALJ should generally give greater weight to an examining source than a non-examining source. *See* 20 C.F.R. § 416.927(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical

opinion of a medical source who has not examined you."). However, an examining medical-source opinion "may be dismissed or discounted" if the ALJ properly evaluates the factors set out in 20 C.F.R. § 404.1527(c) and § 416.927(c) and provides "specific, legitimate reasons for rejecting it." *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (citing *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003)) (internal quotations omitted). The evaluation should consider (1) whether the provider had an examining relationship; (2) whether the provider had a treatment relationship, taking into account (i) the length of the treatment relationship and the frequency of examination and (ii) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; (5) the specialization of the provider in the area; and (6) "other factors" raised by the claimant. *See* 20 C.F.R. § 404.1527(c).

Importantly, an ALJ is not required to explicitly analyze every factor listed in 20 C.F.R. § 404.1527(c). *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (There is "no law . . . requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."). However, the ALJ must provide "good reasons" for why she ascribes less weight to an examining source's opinion. *Id.* The ALJ in this case has failed to provide such reasons. First, she states that the doctors' opinions are unsupported by the medical record. However, as Ms. Zumpone contends, the ALJ attempts to disprove the doctors' psychological findings with evidence from physical examinations. Additionally, the ALJ emphasizes that neither Dr. Benson nor Dr. Neufeld had a treating relationship with the

claimaint. However, Dr. Hanze, whose opinion is assigned the greatest weight, never met Ms. Zumpone, let alone had a treating relationship with her.[1]

Ms. Zumpone does not argue that either of the doctors' opinions should be given the controlling weight of a treating physician. Rather she argues that the ALJ provided illegitimate and inconsistent reasonings for dismissing examining sources' opinions while ascribing great weight to non-examining sources' opinions. ECF No. 12 at 12. Ms. Zumpone specifically argues that the ALJ did not properly support her decision to discount Dr. Benson's and Dr. Neufeld's opinions with the factors outlined in C.F.R. § 404.1527(c). I agree.

As discussed above, examining sources are generally given greater weight than non-examining sources. 20 C.F.R. § 416.927(c)(1). Ms. Zumpone is thus correct that both Dr. Benson and Dr. Neufeld's status as examining sources is relevant to this Court's inquiry. However, an ALJ may discount an examining source's opinion, in favor of a non-examining source's opinion, by analyzing the factors enumerated in 20 C.F.R. 404.1527(c). I must therefore determine whether the ALJ adequately supported her decision with the aforementioned factors.

I find that the ALJ's decision is not adequately supported by the factors outlined in 20 CFR 404.1527(c). With respect to the first factor, the ALJ does not explain how she incorporated the doctors' status as examining sources into her analysis. In fact, she does not mention that either doctor is

---

[1] The ALJ's improper weighing of non-examining over examining medical professionals is not limited to Dr. Neufeld and Dr. Benson. She also did this with Ms. Phipps's opinions. Ms. Phipps worked at Peak Vista Community Health Centers, Ms. Zumpone's primary care provider. Ms. Phipps, a PA-C, began treating Ms. Zumpone in 2015, well before her 2016 onset date. Out of all the medical professionals' opinions considered in this case, Ms. Phipps unquestionably has treated Ms. Zumpone the longest, and still, the ALJ afforded her opinion "little weight." ECF No. 11-2 at 28. However, Ms. Zumpone did not argue this point in her opening brief, and I accordingly will not address it any further.

13

an examining source, which suggests she did not consider this fact in her analysis at all. As to the second factor, the ALJ undermines both doctors' opinions because neither doctor had a lengthy relationship with the claimaint. ECF No. 11-2 at 28. However, she then assigns great weight to the opinions of two agency doctors—Dr. Phelps and Dr. Hanze—who had no relationship whatsoever with Ms. Zumpone, much less a lengthy one. *Id.* Rather than examining Ms. Zumpone, Dr. Phelps and Dr. Hanze merely reviewed her medical records at the agency's request. *Id.* I thus find that the ALJ dispensed with the first two factors and applied inconsistent reasoning across experts.

The third and fourth factors require the ALJ to consider whether the medical opinion at issue is supported by and consistent with the record. C.F.R. § 404.1527(c)(3)-(4). Ms. Zumpone argues that the ALJ erred as to both. I agree.

The ALJ states that both Dr. Neufeld's and Dr. Benson's opinions are unsupported and inconsistent with the medical record. ECF No. 11-2 at 28. Dr. Neufeld performed a psychiatric evaluation and opined that "[Ms. Zumpone] had moderate to marked social interactions, in persistence, and pace." *Id.* The ALJ dismisses Dr. Neufeld's psychiatric evaluation by finding inconsistences in reports from *physical* examinations. According to the ALJ, Dr. Neufeld's "opinion is not supported by observations from treating sources who often noted that the claimaint was pleasant, cooperative, and not in distress." *Id.* In response to this point, Ms. Zumpone argues that the ALJ is comparing "apples to oranges." ECF No. 12 at 13. According to claimant, the ALJ discounts the doctors' *psychological* findings by comparing them to *physical* examinations within the record. *Id.* The ALJ cites nine reports to support her contention that Dr. Neufeld's opinion is inconsistent with the medical record. ECF No. 11-2 at

14

28.  Defendant argues that of these nine reports, at least half have psychiatric findings.  ECF No. 16 at 9.

I agree with defendant that many of the ALJ's cited pages do at least mention psychiatric findings.  However, I agree with Ms. Zumpone that "most of the distress notations cited in the decision are from *constitutional* reviews of Plaintiff, which are based on her *general presentation and physical appearance,* and have nothing to do with psychiatric symptoms."  ECF No. 12 at 14.  While defendant is correct that the cited documents have cursory references to Ms. Zumpone's demeanor, most of these "psychiatric findings" are nothing more than one-line asides within lengthy reports from physical examinations.  *See* ECF No. 11-7 at 7, 21, 30; ECF No. 11-8 at 4, 7; ECF No. 11-10 at 17; ECF No. 11-11 at 14; ECF No. 11-15 at 6.  For instance, many of these documents merely state that Ms. Zumpone was "oriented to time, place, and manner" or acted "with normal judgment" while being examined.  *See* ECF No. 11-7 at 21; ECF No. 11-8 at 4.  None of the ALJ's cited documents—with one odd exception discussed below—are records made for the purpose of conducting a psychological evaluation.  Instead, the ALJ relies on physical examinations and finds minor, one-line references to Ms. Zumpone's behavior and demeanor.  Thus, the ALJ does indeed compare apples to oranges in an attempt to discredit Dr. Neufeld's psychological evaluation.

Notably, the ALJ does cite to one detailed psychological evaluation to disprove Dr. Neufeld's opinion.  Somewhat perplexingly, it is Dr. Neufeld's opinion itself.  ECF No. 11-2 at 28.  The ALJ cites to the fact that Ms. Zumpone was "cooperative" during Dr. Neufeld's evaluation.  ECF No. 11-8 at 62.  According to the ALJ, Dr. Neufeld's opinion that the claimaint was cooperative during her appointment somehow nullifies his opinion that she has marked


limitations in various areas. *Id.* While Dr. Neufeld's report notes that Ms. Zumpone was "cooperative," it immediately thereafter discusses her inability to do basic arithmetic (subtracting three from twenty or seven from one hundred), her tearful and agitated nature, her trouble with memory and recall, her trouble with motivation, and her experience with depression, panic attacks, and severe pain. ECF No. 11-8 at 62. It appears the ALJ cherry picked which evidence supported her finding of nondisability without considering evidence tending to show disability, even when that evidence appeared in the same document and even the same paragraph. The ALJ's selectivity with the record is inappropriate and precluded by law. *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (citing *Switzer v. Heckler*, 742 F.3d 382, 85-86 (7th Cir. 1984)) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."). I therefore find that the ALJ does not satisfactorily demonstrate that Dr. Neufeld's opinion is unsupported by or inconsistent with the medical record.

The ALJ similarly fails to explain her discounting of Dr. Benson's opinion. Regarding his opinion, the ALJ writes

> Dr. Benson opined that the claimaint had marked limitations in her ability to respond appropriately to usual work situations and changes in routine work settings, and in her ability to make judgments on complex work-related decisions. The objective medical evidence or other medical evidence does not support the assessment . . . . For example, it is not consistent with the claimaint's mental status examinations that often indicated the claimaint had normal judgment and insight. . . . For example, it is inconsistent with other treating sources who noted that the claimaint had a good fund of knowledge.

ECF No. 11-2 at 28. Here, the ALJ cites to seven documents to prove that Dr. Benson's opinion is unsupported and inconsistent with the medical record. *Id.* The ALJ again compares apples to oranges. Each of the seven documents are mere constitutional analyses, no more than one line,

taken from physical, not psychological examinations. *See* ECF No. 11-7 at 18, 21, 30; ECF No. 11-8 at 4, 7; ECF No. 11-10 at 6; ECF No. 11-14 at 44. I therefore find that the ALJ does not satisfactorily demonstrate that Dr. Benson's opinion is unsupported by or inconsistent with the medical record.

The fifth and sixth factors to be considered are the opining doctors' specializations and "other factors raised by the claimaint." 20 C.F.R. § 404.1527(c)(5)-(6). As with the first factor in this analysis, the ALJ failed to discuss how, if at all, Dr. Benson's and Dr. Neufeld's specializations factored into her analysis. The ALJ's repeated choice to contradict the doctors' opinions as to their psychological evaluations with physicians' findings from physical examinations further suggests that she did not consider these doctors' specializations at all.

The ALJ's improper discounting of Dr. Benson and Dr. Neufeld's opinions resulted in an RFC determination wholly inconsistent with those opinions. *See* ECF No. 11-2. For instance, Dr. Neufeld concluded that Ms. Zumpone needs assistance and supervision with travel and managing her medical issues and finances "given her impairment in cognition, intellectual ability, and arithmetic calculation and working memory." ECF No. 11-8 at 63. Dr. Benson stated, "[e]ven in unskilled jobs she will struggle because of [her] concrete thought process and she will have especially [have difficulty] in the nuances of social situations . . . things have evolved to a point that she cannot live or function completely independently of [sic] competitively." ECF No. 11-9 at 8. The ALJ discredited these opinions—without properly analyzing any of the six relevant factors—and concluded that Ms. Zumpone could travel independently and work as a marking clerk, product assembler, or mail clerk. ECF No. 11-2 at 23, 29-30.

17

In reaching her RFC determination, the ALJ thus ascribed more weight to a non-examining source than two examining sources.  Further, she did not support her decision to do so with any of the six factors outlined in 20 C.F.R.§404.1527(c)(5).  The ALJ's findings and analyses are therefore inadequate and unsupported by law.

Based on the above reasoning, the ALJ's finding of nondisability is not supported by substantial evidence.  Because the ALJ's decision is deficient in its treatment of Dr Neufeld's and Dr. Benson's opinions and the resulting RFC calculation, I REVERSE and REMAND for proper analysis.

## ORDER

For the reasons described above, the Court REVERSES the Commissioner's decision denying Ms. Zumpone's application for SSI and SSI and REMANDS for reevaluation of the evidence consistent with this order.

DATED this 30th day of September, 2020.

BY THE COURT:

*[signature]*

_____

R. Brooke Jackson
United States District Judge